**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190592-U

Order filed May 12, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0592 Circuit No. 18-CF-742 |
| TERRY L. HOLMS-HANSON, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Hauptman and Lytton concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: Evidence presented at trial was sufficient to prove the defendant guilty beyond a reasonable doubt of aggravated discharge of a firearm and unlawful possession of a firearm.

¶ 2    The defendant, Terry L. Holms-Hanson, appeals his convictions for aggravated discharge of a firearm and two counts of unlawful possession of a firearm. The defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of these offenses.

¶ 3                                I. BACKGROUND

¶ 4        Initially, the State filed a juvenile delinquency petition alleging that the defendant committed the offense of aggravated discharge of a firearm and unlawful possession of a firearm. The court granted the State's motion to transfer the case to criminal court where the defendant was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)), and two counts of unlawful possession of a firearm (*id.* § 24-3.1(a)(1), (a)(2)). Count I of the indictment alleged the defendant "knowingly discharged a firearm in the direction of a motor vehicle he knew to be occupied by another person." Count II alleged defendant, "a person under 18 years of age, knowingly had in his possession a firearm of a size which could be concealed upon his person, being a handgun." Count III alleged defendant, "a person under 21 years of age, knowingly had in his possession a firearm being a handgun and the defendant has been previously adjudged a delinquent for the offense of unlawful possession of a firearm in Peoria County, Illinois case 2017 JD 301."

¶ 5        During the jury trial, Tiffany Harris testified that at approximately 7 p.m. on August 7, 2018, she was stopped at the intersection of Nebraska Street and Wisconsin Avenue in Peoria. Harris observed a white vehicle reversing down Nebraska Street toward Wisconsin Avenue then proceeding on Wisconsin Avenue. A slim young male wearing a long-sleeved brown shirt and light-colored jeans ran down the sidewalk, pointing a gun and shooting at the vehicle. Harris indicated that the shooter ran toward a group of, at least, two other males. When describing the shooter to police, she stated that he was approximately five feet six inches or five feet seven inches tall and weighed 130 pounds. Harris testified that she did her best to look and describe the incident but was scared and attempting to avoid being shot.

¶ 6        Officer Clay Blum of the Peoria Police Department testified that at approximately 7:12 p.m. on August 7, 2018, he arrived at the area of Wisconsin Avenue on a ShotSpotter alert. He

2

explained the ShotSpotter program registered 10 shots fired at approximately 7:08 p.m. Blum discovered seven .22-caliber shell casings on the sidewalk. He testified that there was no one in the immediate area to speak with regarding the incident. He photographed and collected the shell casings. Both the photographs and the shell casings were admitted into evidence.

¶ 7        Anthony Price testified that he was standing outside Sparky's bar on Wisconsin Avenue at the time of the incident. A group of seven or eight young men walked through the parking lot across the street from him. One young man ran to the corner. A white vehicle turned onto Nebraska Street and quickly reversed, and one of the young men began shooting with a handgun. Price ran into the bar when he heard the gunshots, and the group of young men fled. He testified that the shooter wore a tan or brown shirt and pants of an almost identical color. He told officers before trial that he believed the shooter wore tan or yellow clothing.

¶ 8        Forensic scientist Dustin Johnson testified as an expert in firearms identification. He analyzed the seven shell casings found at the scene. All seven shell casings were .22-caliber long/long rifle cartridges which could be fired from a semi-automatic handgun. All of the shell casings were fired from the same firearm.

¶ 9        Brooklyn Irby testified that on August 7, 2018, at approximately 7 p.m., she drove a white Chevy Impala on Wisconsin Avenue near Nebraska Street. Irby's teenage daughter (Julian'na Ross), Ross's friend (Jadakiss Pickett), and Irby's minor son were passengers in the vehicle. While driving, she noticed a group of four boys on the corner. They were the same boys she observed walk past her residence approximately 30 minutes prior to the shooting. One boy pulled a gun from his waist and began shooting at her vehicle. At trial, Irby could not recall the color of the shooter's clothing, only that he was wearing a T-shirt and jeans. Previously, she told police that the shooter was wearing a yellow hooded sweatshirt.

¶ 10    As the shooter ran toward her shooting, bullets began striking the passenger side of the vehicle. Initially, Irby reversed her vehicle, then continued forward on Wisconsin Avenue to turn onto Nebraska Street. As she did this, the shooter ran through a parking lot, following her. She continued to drive evasively, reversing again toward Wisconsin Avenue, then turning back onto Nebraska Street a second time and proceeding home from there.

¶ 11    Irby identified the defendant in open court as the individual that shot at her vehicle. She did not call the police immediately after the shooting, stating that she was in shock and needed to make sure her passengers were unharmed. She testified that she observed damage and denting to the passenger side of her vehicle. Irby also indicated that she wanted to identify the shooter before speaking with police. She learned the identity of the defendant from Ross and Pickett and viewed a photograph of him.

¶ 12    The morning after the shooting, Irby went to Dunkin' Donuts, where the defendant was employed, to confront him. She again identified the defendant in open court as the individual she spoke with at Dunkin' Donuts. When asked why he shot at her vehicle, the defendant replied: "because [her] daughter was talking trash to him." He stated to Irby that he believed Pickett to be her daughter. When she corrected him, he said the shots were not meant for her and she could come back later to discuss the situation. After leaving, Irby noticed a small hole in her vehicle. Photographs of the damage to her vehicle were entered into evidence.

¶ 13    Four days after the incident, on August 11, Irby identified the defendant from a photographic lineup as the individual that shot at her vehicle. Irby wrote on the back of the lineup card that she recognized the defendant's eyes and nose from when he shot at her vehicle.

¶ 14    Ross testified that she was the front seat passenger in Irby's vehicle when the shooting occurred. They were driving on Wisconsin Avenue when she observed a group of boys. One boy

4

began running and shooting at the vehicle. She testified that she thought he was wearing a black jacket; previously she told police the shooter was wearing a yellow jacket.

¶ 15        Ross knew the shooter from parties that she had attended over the summer. He was less than 15 feet away from her and recognized him as he was shooting at the vehicle. She indicated that she was not friends with the shooter but did have him as a friend on Facebook. She knew his name and stated that he went by the nickname Spazz. They had gone to school together when they were younger. Ross identified the defendant in open court as the shooter. After the defendant began shooting, she ducked. Ross's account of how Irby fled the scene was different from the account given by Irby.

¶ 16        Ross testified that she received a Facebook message from the defendant's account later that evening on August 7, which read "Y'all gone have to get me before its one of y'all on smokaa." She did not contact the police regarding this incident because she left it to Irby to handle. On August 11, Ross also selected the defendant from a photographic lineup.

¶ 17        Pickett testified that she was riding in Irby's vehicle on August 7, 2018, when the shooting occurred. She saw a group of boys but was not wearing her glasses and could not identify them. She ducked down when she heard the gunshots and did not see the shooter but recalled seeing someone wearing black and yellow. She gave a different account of how Irby maneuvered the vehicle as she fled the area. Pickett admitted that she previously identified the boys in the group as well as the shooter to police. She informed police that the shooter was the defendant. Pickett selected the defendant as the shooter on the photographic lineup on August 11, 2018, and wrote on the back of the lineup card that she knew him from being at parties, and she made eye contact with him before he shot at the vehicle.

¶ 18    Detective Clint Rezac of the Peoria Police Department testified that he spoke with witnesses regarding the incident and learned that an individual nicknamed Spazz was the shooter. Rezac knew the defendant went by that nickname.

¶ 19    On August 15, 2018, Rezac interviewed the defendant regarding the shooting. The defendant informed Rezac that he was at his girlfriend's house when the shooting occurred. However, messages sent from the defendant's Facebook account indicated that he was in the area of the shooting minutes before the shots were fired. Rezac questioned the defendant regarding his issues with Pickett. The defendant initially denied any issues but eventually admitted that she had been providing a rival street gang with information about himself and his associates. The defendant claimed he knew who Irby's daughter was and accurately described the vehicle she drove the night of the shooting. Rezac testified that the defendant was 17 years old on August 7, 2018. A certified copy of the defendant's juvenile adjudication from March 2018 was admitted into evidence.

¶ 20    Sergeant Clinton DuBois of the Peoria County Sheriff's Department testified that the defendant had a telephone conversation with an associate on August 11, 2019, at 6:45 p.m., while at the Peoria County jail. The conversation had been recorded and included a discussion about offering Ross money to change her testimony, including a reference to messaging Ross right then about the offer. Audio clips of the phone call were admitted into evidence and published to the jury. On cross-examination, DuBois testified that the defendant's height and weight were entered during the booking process and were recorded as 5 foot 11 inches and 170 pounds.

¶ 21    Michael Hirsch, an investigator with the Peoria County State's Attorney's Office, testified that he was informed by Ross that she had received a message from an associate of the defendant offering to pay her to change her testimony. The message was sent August 11, 2019, at 6:46 p.m. A photograph of the message was admitted into evidence.

¶ 22       At the conclusion of the trial, the jury found the defendant guilty of all charges. The court sentenced the defendant to nine years' imprisonment on count I (aggravated discharge of a firearm) and a concurrent term of three years' imprisonment on count II (unlawful possession of a firearm). No sentence was imposed on count III. The defendant appeals.

¶ 23                                    II. ANALYSIS

¶ 24       The defendant argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated discharge of a firearm, unlawful possession of a handgun, and unlawful possession of a firearm. The parties agree there is no real dispute over the fact that an individual possessed a handgun and discharged it at Irby's vehicle. See 720 ILCS 5/24-1.2(a)(2); § 24-3.1(a)(1), (a)(2) (West 2018). Additionally, the record clearly reflects the defendant was under the age of 18 at the time of the offense and had a prior juvenile adjudication. See *id.* Accordingly, the only element at issue is whether the State proved beyond a reasonable doubt that the defendant was the individual that possessed and discharged the handgun.

¶ 25       The defendant argues that the circumstances under which the victims viewed the shooter did not permit a positive identification. He claims that their testimony was undermined by bias and the contradictory nature of various facts relating to the incident, concluding that their testimony was so inconsistent and unreliable that no reasonable jury could have found the defendant guilty beyond a reasonable doubt.

¶ 26       When reviewing the sufficiency of the evidence, the relevant inquiry is whether, viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Howell*, 358 Ill. App. 3d 512, 528 (2005). Under this standard, we allow all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 327 (2005). We will not retry the defendant. *People*

*v. Smith*, 185 Ill. 2d 532, 541 (1999). The trier of fact must "resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court will not replace the trier of fact's judgment with its own regarding the weight of the evidence or witnesses' credibility. *Id.* "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 27        Where identification is the main issue, the State must prove beyond a reasonable doubt the identity of the individual who committed the charged offenses. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). The reliability of an identification is a question for the jury. *People v. Corral*, 2019 IL App (1st) 171501, ¶¶ 81-82. A single eyewitness identification of the accused is sufficient to sustain a conviction, so long as the eyewitness had an adequate opportunity to view the accused and the resulting in-court identification is positive and credible. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

> "[C]ircumstances to be considered in evaluating an identification include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Id.* at 307-08.

¶ 28        Since the only element at issue in this appeal is whether the evidence established beyond a reasonable doubt that the defendant was the person who possessed a handgun and knowingly discharged it at Irby, we begin by evaluating the sufficiency of the witnesses' identification by applying the *Slim* factors. Only Irby and Ross identified the defendant as the shooter during trial.

8

Pickett identified the defendant as the shooter prior to trial but recanted this identification on the stand. Her prior statements to police were presented as impeachment evidence and heard by the jury.

¶ 29    First, we examine the opportunity the witnesses had to view the shooter. The shooting occurred during daylight hours on August 7, 2018. Irby, Ross, and Pickett all testified that they observed a group of boys as they approached the intersection of Wisconsin Avenue and Nebraska Street. Ross testified that the defendant came very close to her on the passenger side of the vehicle as he began to shoot.

¶ 30    Second, the record indicates that the witnesses, especially Irby, exhibited a significant degree of attention. Irby noticed that the group was the same one that had walked past her house 30 minutes prior. She described the way the defendant drew his gun and began shooting. Irby also described the path the shooter took when he was running after her vehicle as she attempted to flee. Ross testified that she ducked down as the shooting began, however, she observed the defendant prior to doing so and recognized him. She knew him from parties she had attended, was friends with him on Facebook, and had attended school with him.

¶ 31    Third, we examine the accuracy of the witnesses' prior description of the defendant. The defendant points out several discrepancies regarding testimony surrounding the route Irby took when she was fleeing, the clothing the defendant wore that day, and the height and weight estimate provided by Harris. The evasive route taken by Irby during the shooting varied between each witness. While this testimony is contradictory, it involves collateral matters and does not speak to the issue at hand. The witnesses varying description of the defendant is more salient as the identity of the shooter is at issue. Again, each witness provided a slightly different description of the shooter's clothing and most had previously provided the police with a different description.

9

Further, Harris's estimate of the shooter's height and weight varied approximately four inches and 40 pounds from when the defendant was booked into the county jail.

¶ 32    Fourth, the witnesses exhibited great certainty when identifying the defendant. Ross and Pickett disclosed to Irby immediately after the shooting that they recognized the shooter as the defendant. They provided Irby with a photograph of the defendant from his Facebook page. Irby spoke with the defendant at his job and testified that the person she spoke to was the same person that shot at her vehicle. She selected the defendant's photograph from the lineup, indicating that she recognized his eyes and nose. Ross also demonstrated great certainty, testifying that she viewed the defendant prior to him shooting and recognized him. She knew his name and his nickname. She was friends with him on Facebook. She also identified him in open court as the shooter and selected him from a photographic lineup.

¶ 33    Fifth, the record establishes that the witnesses' identification of the defendant as the shooter occurred without significant delay. Specifically, Irby, Ross, and Pickett identified the defendant as the shooter just four days after the shooting.

¶ 34    We acknowledge that the discrepancies discussed above certainly affect the weight of the identification testimony. See *People v. Pearson*, 324 Ill. App. 3d 622, 626 (2001) ("Discrepancies and omissions as to facial and other physical features are not fatal but affect the weight to be given the identification testimony."). However, "[p]recise accuracy in describing the facial characteristics and clothing of the defendants is not necessary where the identification is positive." *People v. Sanders*, 38 Ill. App. 3d 473, 480 (1976). Here, where the witnesses had the opportunity to view the shooter, the record demonstrated evidence of a significant degree of attention, and the identification of the defendant as the shooter was repeated and consistent, we conclude that the witnesses viewed the shooter under circumstances permitting a positive identification.

10

¶ 35    Further, the jury heard evidence of the defendant's conversations with Irby and Rezac in which, he disclosed to Irby why he had shot at her vehicle and described that vehicle to Rezac. The defendant's Facebook messages put him in the area of the shooting. Additionally, the defendant commissioned someone to bribe Ross to change her testimony before the start of trial. Viewing this evidence in the light most favorable to the State, we conclude that a rational jury could have found the identifications reliable and the evidence sufficient to prove the defendant guilty beyond a reasonable doubt.

¶ 36                                          III. CONCLUSION

¶ 37    The judgment of the circuit court of Peoria County is affirmed.

¶ 38    Affirmed.

11